IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY DIMEO, III | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| TUCKER MAX | : | NO. 06-1544 |

MEMORANDUM

Dalzell, J.                                        May 26, 2006

Tucker Max describes himself as an aspiring celebrity "drunk" and "asshole" who uses his Web site, www.tuckermax.com, to "share [his] adventures with the world."[1]  Anthony DiMeo, III, who says he is an heir and co-owner of a large New Jersey blueberry farm, threw a New Year's Eve party this past December that, apparently, ended in a shambles.  The paths of these two men converge on Max's Web site, which hosts a number of message boards that allow Internet users to post anonymous comments on different topics.  One of those topics is DiMeo's New Year's Eve party.

DiMeo sues Max for six postings that he finds offensive.  DiMeo does not allege that Max authored the posts.  Rather, he claims that Max "through his [Web site] publishes defamatory statements aimed at Plaintiff. . . ."  Comp. ¶ 5.  DiMeo sues for defamation and for Max's alleged violation of 47 U.S.C. § 223(a)(1)(3), a criminal statute that prohibits anonymously using a telecommunications device to harass someone.

---

[1]     See Tucker Max Homepage, at http://www.tuckermax.com (last visited May 18, 2006).

I.   **Factual and Procedural Background**

On December 31, 2005, Renamity, Anthony DiMeo's
publicity firm, organized what turned out to be the New Year's
Eve party from hell.[2]  See, e.g., Michael Klein, Real Noisemaking
Begins After New Year's Party Fracas, Phila. Inquirer, Jan. 5,
2006, at E3 (hereinafter "Real Noisemaking"); The Art of the
Deal; An Artist's Paintings Are Stolen and Damaged at a New
Year's Party Gone Terribly Wrong, Phila. Weekly, Jan. 11, 2006,
at 18; Michael Klein, The Party's Very Much Over: Promoter Is
Suing, Phila. Inquirer, Jan. 19, 2006, at E3 (hereinafter
"Promoter Is Suing").  Renamity first contracted with Athmane
Kabir, owner of Le Jardin, a restaurant located in the
Philadelphia Art Alliance gallery, to host 325 guests on New
Year's Eve for a four-hour party with food and an open bar.  Real
Noisemaking, at E3.  Twice as many people appeared.  Id.  When
alcohol and food ran out well before midnight, attendees -- who
had paid $100 each -- became disenchanted:

> The staid, sprawling landmark on Rittenhouse
> Square never saw such a ruckus.  Patrons
> seeking food burst through doors leading into
> a dining room of Kabir's Le Jardin
> restaurant.  Two mixed-media works on loan by
> Antonio Puri were stolen from museum walls.
> Sconces were torn.  Someone tried to haul off
> the donations box.  Kabir, fearing injuries,
> called police about 10:30 p.m.

---

[2]   These facts place the postings at issue in proper
context.  On DiMeo's Web site, he describes Renamity as
"specializing in . . VIP launch events and special event
production."  See Anthony DiMeo III Web site at
http://www.anthonydimeo.com (last visited May 26, 2006).

-2-

Id.  While the arrival of police dispersed the crowd, it did not

dissipate its anger, which apparently needed an outlet.[3]

Enter Tucker Max, a Duke Law School graduate whose

professed goal in life is "[t]o be a celebrity that gets paid to

---

[3]     This lawsuit is not the only one to emerge from the New
Year's Eve fiasco.  According to the Philadelphia Inquirer, on
January 10, 2006, DiMeo sued Le Jardin for "misstatements."
Promoter Is Suing, at E3.  In that article, Le Jardin's attorney
reported that his client would counter-sue.  Id.
        Neither DiMeo nor Max is a stranger to court
proceedings.  Last year, DiMeo sued Philadelphia Weekly and its
former gossip columnist, Jessica Pressler, after Pressler
parodied the holiday card DiMeo emailed to his friends and
family.  Josh Cornfield, Party Heads to Court: Lawsuits in Works
Over New Years's Eve Bash Gone Bad, Philly Metro, at
http://philly.metro.us/metro/local/article/Party_heads_to_court/7
65.html; Doron Taussig, Here's What's Fun -- You're Getting
Served, Philadelphia City Paper, at http://citypaper.net/articles
/2005-03-03/fineprint.shtml [hereinafter Taussig].  The card
displayed DiMeo posing next to a Christmas tree.  Next to an
image of the card that she displayed in her column, Pressler
wrote, "In 2004, I learned that I am so amazing that I get off
all day simply on the incredible feeling of being myself."
Taussig.
        Max's introduction to the court system occurred in 2003
when Katy Johnson, who was Miss Vermont in both 1999 and 2001,
sued him.  See, e.g., Adam Liptak, Internet Battle Raises
Questions About Privacy and the First Amendment, N.Y. Times, June
2, 2003, at A13.  On his Web site, Max posted an article that
"contained a long account of his relationship with Ms. Johnson,
whom he portrayed, according to court papers, as vapid,
promiscuous and an unlikely candidate for membership in the
Sobriety Society [that she founded]."  Id.  Johnson's attorneys
persuaded the Honorable Diana Lewis of the Circuit Court in West
Palm Beach, Florida to enjoin Max  -- without service or a
hearing -- from writing about Johnson.  Id.  Judge Lewis's
ruling, which one legal commentator called "not only a prior
restraint of Max's speech activities, but one of remarkable
breadth," sparked "a flurry of worldwide media attention."
Stewart Harris, A Tale of Two Sites and a Lawsuit: Injunction
Against Web Site Owner Was the Legal Issue in Suit Over Salacious
Story, Nat. L.J., July 28, 2003, at 19.  On June 6, 2003, Max
removed that case to federal court, filed a motion to dismiss,
and filed a motion (endorsed by the American Civil Liberties
Union) to dissolve the temporary injunction.  Id.  Shortly after
Max's counter-attack, Johnson voluntarily dismissed her case.
Id.

get drunk, act like an asshole, and get drunk some more."  Tucker Max Personal Info, at http://www.tuckermax.com/archives/entries/ personal_info.phtml (last visited May 18, 2006).  His Homepage reports that he has achieved his second aspiration.  Id.  Max spends much of his time running www.tuckermax.com, which he often uses to post anecdotes about his life.  Max's Web site also hosts a number of message boards, with several devoted to DiMeo's New Year's Eve party.

The posts on these message boards -- many of them laden with vulgarity -- fall into three categories.  First, a number comment about DiMeo's event.  One author, for example, under the pseudonym "Jerkoff", wrote, "So what happened?  Just shitty planning?  From the looks of it, they got way more people that [sic] they wanted, the crowd was nasty, and the bartenders were stoned."  Def.'s Mot. to Dismiss Mem., Ex. I, at 2.

The second group of posts ridicules DiMeo.  Noting an online photograph of DiMeo modeling,[4] for example, an author wrote:

When the fuck did he become a model?

And what the fuck does the photographer say to him to get him to make that face?

OK Anthony, I have this. . . this . . . this brilliant idea.  Hear me out now.  I want you

---

[4]    According to his Web site, DiMeo generates income by (a) helping to run his family's southern New Jersey blueberry farms, (b) acting, (c) managing Renamity, and (d) working as a wealth manager.  See Anthony DiMeo III Web site, at http://www.anthonydimeo.com (last visited May 26, 2006).  As a member of the Screen Actors Guild, DiMeo claims he has done "[c]ommercial print modeling."  Id.

to make a face like you were getting fisted
by an angry gorilla.  Ok, now mold your face
to what you think you would look like if a
leper were about to take a shit in your
mouth.  WORK WITH ME.  EXCELLENT!

Id. at 22.

The third category of posts expresses outright
animosity toward DiMeo.  One author wrote, for example, "What a
douche-bag!  This guy sounds like the type of pompous,
pretentious jackass that I take great pleasure in giving reality
checks to. . . but often can't locate. . . ."  Id. at 45.
Another poster wrote, "This guy is such a tool. . . I am amazed
he has not been beaten in the street."  Id. at 57.

On or around March 10, 2006, DiMeo sued Max in the
Court of Common Pleas of Philadelphia County.  In the complaint,
he objected to six posts that, he claimed, typify those about him
on Max's message boards:

(1) "Maybe you should find your validation
elsewhere. . . preferably at the end of a
magnum," Compl. ¶ 5.a;

(2) "I just wanted to let you know that I
think that you are the biggest piece of shit
I have ever heard of and I hope that you die
soon," id. ¶ 5.b;

(3) "Now I know why Arlen Specter got invited
to all those Renamity
Http://www.renamity.com/galary/birthdaybash/e
scf0009 parties!  Could it be. . . bribery of
your local politician?" id. ¶ 5.c;

(4) "He's got a neat, nice little page there
from which we can harass him," id. ¶ 5.d;

(5) "I can't believe no one has killed him
yet," id. ¶ 5.e; and

(6) "You threw an absolutely disastrous party

on New Year's Eve precipitated by false
advertising and possible fraud," id. ¶ 5.f.

As noted before, DiMeo does not allege that Max wrote any of
these himself, but only that Max "through his [Web site]
publishes defamatory statements aimed at Plaintiff. . . ."  Comp.
¶ 5.  Max does not dispute that he selects, removes, and alters
posts on the message boards.  See, e.g., Def.'s Reply in Further
Supp. of Mot. to Dismiss, at 2.  Based on these allegations,
DiMeo sues for defamation in Count One and, in Count Two, for
Max's alleged violation of 47 U.S.C. § 223(a)(1)(3).[5]

On April 12, 2006, Max removed DiMeo's lawsuit to this
Court.[6]  About a week later, Max filed the instant motion to
dismiss which DiMeo opposes.  At the end of his response, DiMeo
adds a one-sentence request for leave to file an amended
complaint.[7]  We shall grant Max's motion, deny DiMeo's request

_____

[5]    Count Three is a claim for punitive damages.  Because
punitive damages are a legal remedy rather than a cause of
action, we shall summarily dismiss it.

[6]    On April 24, 2006, DiMeo filed a petition to remand
this matter back to the Court of Common Pleas.  In an Order
yesterday, we denied that frivolous petition.  As DiMeo's action
invokes a federal statute as a basis for relief, we have federal
question jurisdiction.  There seems to be no dispute that we also
have diversity jurisdiction, as the parties are citizens of
different states (DiMeo of Pennsylvania and Max of New York) and
the amount in controversy exceeds $75,000.

[7]    DiMeo's response contained new factual allegations that
we set forth in footnote 17, infra.
       Plaintiff's counsel requested the opportunity for
additional briefing.  We granted his request and permitted him to
file a consolidated supplemental brief by noon on May 14, 2006.
Curiously (in light of his request), about ten minutes before
that noon deadline, plaintiff's counsel faxed us a letter
advising, "Plaintiff has decided to rest on his briefs already
submitted."  Thus, he declined to avail himself of the

for leave to amend, and dismiss this matter with prejudice.

## II.  __Legal Analysis__

Under Fed. R. Civ. P. 12(b)(6), we may dismiss a complaint for "failure to state a claim upon which relief can be granted."  In addition to taking all factual allegations as true, we must draw all reasonable inferences in plaintiff's favor.  See In re Warfarin Sodium Antitrust Litig., 214 F.3d 395, 397 (3d Cir. 2000).  Rule 12(b)(6) permits dismissal only if "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief."  Conley v. Gibson, 355 U.S. 41, 45-46 (1957).

### 1.  __Count One__

In Count One, DiMeo sues for defamation.  The primary issue in this case is whether § 509 of the Communications Decency Act,[8] codified at 47 U.S.C. § 230, bars this claim.  47 U.S.C. § 230(c)(1) states that "[n]o provider or user of an interactive

---

opportunity he himself requested.

[8]    Title V of the Telecommunications Act of 1996, Pub. L. No. 104-104, 110 Stat. 56 (1996), is known as the "Communications Decency Act of 1996."  Congress's main goal in enacting the CDA was to limit the exposure of minors to indecent material on the Internet.  See Pub. L. No. 104-104, Title V (1996); see also H.R. Rep. No. 104-458, at 81-91 (1996); S. Rep. No. 104-230, at 187-93 (1996); S. Rep. No. 104-23, at 9 (1995).  Almost exactly ten years ago, this Court struck down part of the CDA, see American Civil Liberties Union v. Reno, 929 F. Supp. 824 (E.D. Pa. 1996) (Sloviter, C.J., Buckwalter, and Dalzell, JJ.), affirmed, 521 U.S. 844 (1997), but the Section at issue in this case, § 230, remains intact.  Representatives Christopher Cox (R-Cal.) and Ron Wyden (D-Ore.) introduced § 230 as an amendment to the CDA.  See 141 Cong. Rec. H8468-70 (Aug. 4, 1995).

computer service shall be treated as the publisher or speaker of any information provided by another information content provider."  Because of a preemption clause in § 230(e)(3),[9] § 230(c)(1) overrides the traditional treatment of publishers under statutory and common law:

> The provision "precludes courts from entertaining claims that would place a computer service provider in a publisher's role," and therefore bars "lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions -- such as deciding whether to publish, withdraw, postpone, or alter content."

Green v. America Online, 318 F.3d 465, 471 (3d Cir. 2003) (quoting Zeran v. America Online Inc., 129 F.3d 327, 330 (4th Cir. 1997)).

Congress enacted § 230(c)(1) to advance two objectives. First, Congress wanted to promote the free exchange of information and ideas over the Internet.  In specific statutory findings, Congress stressed that "[t]he Internet and other interactive computer services offer a forum for a true diversity of political discourse, unique opportunities for cultural development, and myriad avenues for intellectual activity." § 230(a)(3); see also § 230(a)(5) ("Increasingly Americans are relying on interactive media for a variety of political, educational, cultural and entertainment services."); § 230(a)(1)

---

[9]      That provision reads, "No cause of action may be brought and no liability may be imposed under any State or local law that is inconsistent with this section."  47 U.S.C. § 230(e)(3).

("The rapidly developing array of Internet and other interactive computer services available to individual Americans represent an extraordinary advance in the availability of educational and informational resources to our citizens.").  In these findings Congress also took pains to emphasize that, "[t]he Internet and other interactive computer services have flourished, to the benefit of all Americans, <u>with a minimum of government regulation</u>." § 230(a)(4) (emphasis added).

Congress believed that § 230(c)(1) would promote these ideals.  With the number of Internet users reaching the hundreds of millions, the quantum of information conveyed through interactive computer agencies is staggering:

> The specter of tort liability in an area of
> such prolific speech would have an obvious
> chilling effect.  It would be impossible for
> service providers to screen each of their
> millions of postings for possible problems.
> Faced with potential liability for each
> message republished by their services,
> interactive computer service providers might
> choose to severely restrict the number and
> type of messages posted.

<u>Zeran</u>, 129 F.3d at 331.  In other words, absent federal statutory protection, interactive computer services would essentially have two choices: (1) employ an army of highly trained monitors to patrol (in real time) each chatroom, message board, and blog to screen any message that one could label defamatory, or (2) simply avoid such a massive headache and shut down these fora.  Either option would profoundly chill Internet speech.[10]

_____

[10]    Interestingly, the <u>New York Times</u> reports that the Chinese employ 50,000 censors to watch the Internet for anything

Congress enacted § 230 to advance a second goal -- to "encourage service providers to self-regulate the dissemination of offensive material over their services." Id. See also § 230(b)(4) ("It is the policy of the United States . . . to remove disincentives for the development and utilization of blocking and filtering technologies that empower parents to restrict their children's access to objectionable or inappropriate online material."); 141 Cong. Rec. H8469-70 (Aug. 4, 1995) (statements of Reps. Cox, Wyden, and Barton); 141 Cong. Rec. H8469-72 (Aug. 4, 1995) (statements of Reps. Cox, Wyden, Lofgren, and Goodlatte).

Under pre-CDA jurisprudence, interactive service providers that removed offensive material from their sites risked liability.  In Stratton Oakmont, Inc. v. Prodigy Servs. Co., 1995 WL 323710, at *3-4 (N.Y. Sup. Ct. May 24, 1995), for example, New York's Supreme Court held a service provider liable because it screened and edited messages posted on its bulletin boards.  Id. This editorial activity, the court reasoned, rendered the provider a publisher for defamation purposes and thus subject to strict liability.  Id.

Concerned that cases like Stratton Oakmont would discourage providers from screening offensive content on their own sites, Congress enacted § 230(c)(2)(A) to insulate them from liability for

the state regards as offensive.  See Howard W. French, As Chinese Students Go Online, Little Sister Is Watching, N.Y. Times, May 9, 2006 at A3.

> any action voluntarily taken in good faith to
> restrict access to or availability of
> material that the provider or user considers
> to be obscene, lewd, lascivious, filthy,
> excessively violent, harassing, or otherwise
> objectionable, whether or not such material
> is constitutionally protected.

47 U.S.C. § 230(c)(2)(A).  Both the House and Senate emphasized that "[o]ne of the specific purposes of this section is to overrule Stratton-Oakmont v. Prodigy and any other similar decisions which have treated such providers and users as publishers or speakers of content that is not their own . . . ." H.R. Rep. No. 104-458, at 194 (1996); S. Rep. No. 104-230, at 194 (containing same quote).

### a.   Application of § 230(c)(1)

Three elements are required for § 230(c)(1) immunity. First, the defendant must be a provider or user of an "interactive computer service."  Second, the asserted claims must treat the defendant as a publisher or speaker of information. Third, the challenged communication must be "information provided by another information content provider."

At the outset, DiMeo's defamation claim treats Max as the publisher or speaker of the six posts he finds offensive. DiMeo does not allege that Max wrote any of the posts.  Instead, he claims only that Max "through his [Web site] publishes defamatory statements aimed at Plaintiff. . . ."  Comp. ¶ 5.

As to the first element, "interactive computer service" means, in relevant part, "any information service, system, or

access software provider that provides or enables computer access
by multiple users to a computer server. . . ."  § 230(f)(2).
Max's Web site "provide[s]" and definitely "use[s]" an
"interactive computer service."  Because it is a "service" that
"enables computer access" by multiple users to a computer server,
see 47 U.S.C. § 230(f)(2), Max's Web site is a "provider."  <u>See</u>
<u>Parker v. Google, Inc.</u>, --- F. Supp. 2d ---, 2006 WL 680916, at
*6 (E.D. Pa. Mar. 10, 2006) (holding that Google "provide[s]" an
interactive computer service); <u>Carafano v. Metrosplash.com</u>, Inc.,
207 F. Supp. 2d 1055, 1065-66 (C.D. Cal. 2002) (same for online
matchmaking Web site), <u>aff'd</u>, 339 F.3d 1119 (9th Cir. 2003);
<u>Schneider v. Amazon.com, Inc.</u>, 31 P.3d 37, 39-41 (Wash. App.
2001) (same for Amazon.com).  In any event, for Max's Web site to
exist, it must access the Internet through some form of
interactive computer service; otherwise, the public could not
view it.  Thus, his Web site is also the "user" of an interactive
computer service.  <u>See</u> <u>Batzel v. Smith</u>, 333 F.3d 1018, 1030 (9th
Cir. 2002) ("[T]o make its Web site available and to mail out the
listserv, the Network *must* access the Internet through some form
of 'interactive computer service.'").

     As for the last element, the posts must constitute
"information provided by another information content provider."
47 U.S.C. § 230(c)(1).  Under § 230(f)(3), "information content
provider" means "any person or entity that is responsible, in
whole or in part, for the creation or development of information
provided through the Internet or any other interactive computer

-12-

service." Max did not create the anonymous posts. The posters authored them entirely on their own.

In the face of these inconvenient realities, DiMeo falls back on the position that, because Max can select which posts to publish and edits their content, he exercises a degree of editorial control that rises to the "development of information ." See Pl.'s Resp. to Def.'s Mot. to Dismiss & Pl.'s Mot. for Leave To Am. ("Pl.'s Resp."), at (unnumbered) 3. If "development of information" carried the liberal definition that DiMeo suggests, then § 230 would deter the very behavior that Congress sought to encourage. In other words, § 230(c)(1) would not protect services that edited or removed offensive material. Yet, as noted earlier, one of Congress's goals in enacting § 230 was to promote this kind of self-regulation. Thus, "development of information" must mean "something more substantial than merely editing portions of [content] and selecting material for publication."[11] Batzel, 333 F.3d at 1031; see also Green v. America Online, 318 F.3d 465, 471 (3d Cir. 2003) (holding that § 230(c)(1) bars "'lawsuits seeking to hold a service provider liable for its exercise of a publisher's traditional editorial functions -- such as deciding whether to publish, withdraw, postpone, or alter content.") (quoting Zeran v. America Online,

_____

[11]     Also, if we interpreted "development" broadly, then few online publishers would receive § 230(c)(1) immunity for the simple reason that most "choose among proffered material and . . . edit the material published while retaining [the material's] basic form and message." Batzel, 333 F.3d at 1031.

Inc., 129 F.3d 327, 330 (4th Cir. 1997)).[12]  Because DiMeo
alleges that Max did no more than select and edit posts, we
cannot consider him to be the "provider" of the "content" that
DiMeo finds to be offensive.[13]

        In sum, Max's Web site uses (and likely provides) an
"interactive computer service."  DiMeo seeks to treat Max as a
publisher or speaker of information.  And the six posts
constitute "information provided by another information content
provider."  See 47 U.S.C. § 230(c)(1).  Thus, the statute blocks
DiMeo's defamation claim.  See 47 U.S.C. § 230(e)(3).[14]

─────────────

        [12]    Several other cases are equally pertinent.  See Donato
v. Moldow, 865 A.2d 711 (N.J. Super. 2005) (holding that bulletin
board operator's selective editing, deletion, and re-writing of
anonymously posted messages did not transform the board into an
"information content provider");  Carafano v. Metrosplash.com,
Inc., 339 F.3d 1119, 1124 (9th Cir. 2003) (noting that "so long
as a third party willingly provides the essential published
content, the interactive service provider receives full immunity
regardless of the specific editing or selection process"); Ben
Ezra, Weinstein, & Co. v. America Online, Inc., 206 F.3d 980, 985
(10th Cir. 2000) (holding that editing and altering stock
quotations authored by a third party does not transform a
defendant into an "information content provider"); Blumenthal v.
Drudge, 992 F. Supp. 44, 49-53 (D.D.C. 1998) (holding that
America Online was not an "information content provider" even
though it had editorial control over content in an allegedly
defamatory gossip column).

        [13]    Our conclusion does not mean that the author of a
defamatory statement escapes accountability.  As the United
States Court of Appeals for the Forth Circuit has pointed out,
"While Congress acted to keep government regulation of the
Internet to a minimum, it also found it to be the policy of the
United States 'to ensure vigorous enforcement of Federal criminal
laws to deter and punish trafficking in obscenity, stalking, and
harassment by means of computer.'"  Zeran, 129 F.3d at 330
(quoting 47 U.S.C. § 230(b)(5)).

        [14]    It would also seem that, even putting aside the
preemption issue, DiMeo's defamation claim would still not
survive.  Four of the six statements he challenges -- numbered

                                   -14-

**2.   Count Two**

In Count Two, DiMeo seeks to hold Max civilly liable under 47 U.S.C. § 223(a)(1)(c), a federal statute that criminalizes "utiliz[ing] a telecommunications device . . . without disclosing [one's] identity and with intent to annoy, abuse, threaten, or harass any person . . . who receives the communications."  In his response to Max's motion to dismiss, DiMeo's attorney writes, "Plaintiff instantly requests this Honorable Court's Leave to Amend his Complaint to eliminate Count II as stated, without prejudice to incorporate same into Plaintiff's claim of Defamation, as well as Plaintiff's prospective new claims for Intention [sic] Infliction of Emotional Distress and Defendant's Civil Rico violation."  Pl.'s Resp., at (unnumbered) 5.  Linguistically challenging as this sentence is, we interpret it to mean that DiMeo's lawyer thinks

---

one, two, four, and five above -- are expressions of opinion that cannot be proven true or false.  See Milkovich v. Lorain Journal Co., 497 U.S. 1, 20 (1990) ("[T]he *Bresler-Letter Carriers-Falwell* line of cases provides protection for statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual.") (quoting Hustler Magazine v. Falwell, 485 U.S. 46, 50 (1988)).  These statements are constitutionally protected.  As for the remaining two, under Pennsylvania law, a court must view allegedly defamatory statements "in context" to determine the "'effect the [writing] is fairly calculated to produce, the impression it would naturally engender, in the minds of the average persons among whom it is intended to circulate.'" Savitsky v. Shenandoah Valley Pub. Corp., 566 A.2d 901, 904 (Pa. Super. 1989) (citing Baker v. Lafayette College, 532 A.2d 399 (1987) and quoting Corabi v. Curtis Publishing Co., 273 A.2d 899, 907 (1971)).  After viewing the tuckermax.com message boards, which are read by people using screen names like "Jerkoff," "Drunken DJ," and "footinmouth," the intended audience could not mistake the site for the New York Times.  In short, it palpably is not serious.

he can, somehow, make Count Two viable.

        At the threshold, DiMeo bases Count Two on a criminal statute, and he does not even try to show that § 223(a)(1)(3) provides a private right of action.  See Cort v. Ash, 422 U.S. 66, 78 (1975) (setting forth four-part test to determine whether a private right of action exists), and more recent jurisprudence that applies even stricter approaches to implying private rights of action.  See, e.g., Alexander v. Sandoval, 532 U.S. 275 (2001).

        Even putting that threshold problem aside, Count Two would still fail for at least two other reasons.  First, § 223(a)(1)(3) applies only to one who uses a telecommunications device "without disclosing [one's] identity."  Here, however, DiMeo does not allege that Max failed to disclose his identity.  Nor could he.  Max's Web site -- which hosts the message boards -- is called "www.tuckermax.com," the message boards are called the "Tucker Max Message Boards," and Max himself posts messages in his own name.[15]

        Second, § 223(a)(1)(c) applies only to one who "makes a telephone call or utilizes a telecommunications device."  As Max obviously made no telephone call, DiMeo must fall back on the position that he "utilize[d] a telecommunications device."  The

---

        [15]    While we normally may not look outside the pleadings in resolving a motion to dismiss, we may consider documents that are "integral to or explicitly relied upon" in the complaint.  See In re Burlington Coat Factory Sec. Litig., 114 F.3d 1410, 1426 (3d Cir. 1997).  Here, the entire basis of the complaint is the www.tuckermax.com message board.

problem with that reading is that in 47 U.S.C. § 223(h)(1)(B), Congress emphasized that the term "telecommunications device . . . does <u>not</u> include an interactive computer service." (emphasis added).  Because we earlier found that Max's Web site is an interactive computer service, § 223(a)(1)(3) -- even if there were a private right of action -- would be unavailing.

### 3.  **Request to Amend**

As noted, DiMeo also requests leave to amend his complaint to add claims for "Intention [sic] Infliction of Emotional Distress and Defendant's Civil Rico violation."  Pl.'s Resp., at (unnumbered) 5.  As a preliminary matter, DiMeo was not required to seek leave to amend.  Fed. R. Civ. P. 15(a) allows "[a] party [to] amend the party's pleading once as a matter of course at any time before a responsive pleading is served. . . . Otherwise a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires."  Because a motion to dismiss is not a responsive pleading, see <u>Centifanti v. Nix</u>, 865 F.2d 1422, 1431 n.9 (3d Cir. 1989), DiMeo was not required to seek antecedent leave from us.  Because he opted to do so, however, we will consider his request now.  <u>See id</u>.

A court may deny leave when amendment would be futile.[16]  <u>See</u> <u>Foman v. Davis</u>, 371 U.S. 178, 182 (1962) (noting

---

[16]    While we deny the motion on futility grounds, we also point out that DiMeo's lawyer failed to take the time to submit a memorandum of law, as required by Local R. Civ. P. 7.1(c) and

that a court may deny leave when faced with "futility of amendment"). An amendment would be futile when "the complaint, as amended, would fail to state a claim upon which relief could be granted." In re NAHC, Inc. Securities Litig., 306 F.3d 1314, 1332 (3d Cir. 2002) (quoting In re Burlington Coat Factory, 113 F.3d 1410, 1437 (3d Cir. 1997)).

Here, DiMeo's proposed amended complaint would fail to state a claim upon which relief could be granted. Like the defamation claim, his prospective intentional infliction claim would fall to 47 U.S.C. § 230(c)(1). Moreover, even accepting all of the new allegations he sets forth in his response to Max's motion to dismiss,[17] DiMeo cannot plead a viable civil RICO

---

Fed. R. Civ. P. 7(b)(1). This is even more baffling because we granted his request to submit a supplemental brief, an opportunity that he then declined.

[17]    In his response, DiMeo alleges that:

I.    Max has "published statements" that (1) threaten violence and death to DiMeo, (2) allege that DiMeo is committing bribery, (3) claim that DiMeo is a homosexual, and (4) assert that DiMeo is promoting Renamity through false advertising and fraud, Pl.'s Resp., at (unnumbered) 1;

II.    Max has posted information about DiMeo and his family, to wit, (1) his aunt's and grandmother's private phone number, (2) his cousin's photograph, and (3) his own private contact information, id. at (unnumbered) 1-2;

III. DiMeo and his family have received death threats and been "bombarded with criminally harassing phone calls," id. at (unnumbered) 2; and

IV.    DiMeo "lives in constant fear for his safety and the safety of his loved ones, has sought related psychological counseling, and has suffered the loss of his privacy, as well as the commercial ramifications that intuitively would arise from his public relations company being cast in the spot-light of public ridicule," id.

-18-

claim.  To plead such a claim, one must, <u>inter alia</u>, allege that
the defendant engaged in a "pattern" of racketeering activities.
18 U.S.C. § 1962.  To have engaged in such a "pattern," Max must
have committed at least two of the predicate crimes enumerated in
18 U.S.C. § 1961(1).  <u>See</u> 18 U.S.C. § 1961(5).  DiMeo does not
even intimate that Max committed one of these offenses.  While he
does claim that Max criminally violated 18 U.S.C. § 223(a)(1)(3),
see Pl.'s Resp., at (unnumbered) 4, that offense is not a RICO
predicate.  <u>See</u> 18 U.S.C. § 1961(1).  Even if it were, as we
explained above, Max did not commit it because (1) he disclosed
his identity and (2) did not use the requisite
"telecommunications device."  <u>See</u> 47 U.S.C. § 223(h)(1)(B).

## III.  <u>Conclusion</u>

As we noted the last time we discussed the CDA,

> Some of the dialogue on the Internet
> surely tests the limits of conventional
> discourse.  Speech on the Internet can be
> unfiltered, unpolished, and unconventional,
> even emotionally charged, sexually explicit,
> and vulgar -- in a word, "indecent" in many
> communities.  But we should expect such
> speech to occur in a medium in which citizens
> from all walks of life have a voice.

<u>American Civil Liberties Union v. Reno</u>, 929 F. Supp. 824, 882
(E.D. Pa. 1996).

There is no question that tuckermax.com could be a
poster child for the vulgarity we had in mind in 1996.  But as we
added then, "[w]e should also protect the autonomy that such a
medium confers to ordinary people as well as media magnates."

-19-

<u>Id.</u>  Here we do so by protecting the coarse conversation that, it appears, never ends on tuckermax.com.


                    BY THE COURT:

                    <u>/s/ Stewart Dalzell, J.   </u>